Case number 20-1376. Hemp Industries Association and RE Botanicals, Inc. Petitioners v. Drug Enforcement Administration and Ann Milgram, Administrator of Drug Enforcement Administration. Mr. Pennington for the petitioners, Ms. Carroll for the respondents. Mr. Pennington, good morning. Morning. Please proceed. May it please the court. Shane Pennington for petitioners, Hemp Industries Association and RE Botanicals, Inc. Your honors, I'd like to spend the time that I have today primarily starting with standing and then moving to try to clarify what may be some confusion about the primary substantive points that petitioners challenge with respect to DEA's interim final rule. Beginning with standing, the Hemp Industries Association, I think a good place to start is with the 2004 Ninth Circuit case. Hemp Industries Association versus... Counsel, I'd rather you start with a specific reference to what it is about the regulation that bothers you and why it hurts you. Sure, your honor. So... Well, in all due respect, that's standing as far as I'm concerned. Yes, I agree. Right. Absolutely, your honors. So, if you go to the newly promulgated regulation that's at issue from the interim final rule, it addresses tetrahydrocannabinols naturally contained in the plant cannabis sativa L. Those natural tetrahydrocannabinols are a substance that every handles or interacts with. Counsel, please just focus on the language and tell me why the language bothers you. So, the language is... The definition of natural tetrahydrocannabinols at 21 CFR 1308.11D31 and DEA's regulation defines that term tetrahydrocannabinols to include tetrahydrocannabinols naturally contained in the cannabis plant. And the reason that that is harmful to the hemp industry and to every hemp company is because every hemp company inevitably and necessarily handles natural tetrahydrocannabinols. And we know that from the record because... Well, you know it from the record. I mean, if you look at the petition for review, you'll see that Rebotanicals and 300 some companies that are members of Hemp Industries Association are manufacturers and processors of hemp and hemp is parts or all of the cannabis plant. Yeah, but please focus on the language. You're saying the regulation differs from the statute? Yes, your honor. So... In other words, you're not challenging the statute? No, your honor. You're challenging the regulation, arguing the regulation is different from the statute? Yes. In one specific... Where is it different and why? And why does that hurt you? So the statute excludes from this reference to schedule one tetrahydrocannabinols in hemp. The statute refers to tetrahydrocannabinols in hemp. As opposed to defined as hemp? Yes, your honor. And that difference really matters because all natural tetrahydrocannabinols occur in hemp, but not all of them meet the definition of hemp. And so, for example, take Delta-9 tetrahydrocannabinol. Delta-9 tetrahydrocannabinol occurs in hemp, quite obviously, because that's the material that determines whether hemp falls, whether a cannabis material falls on one side of the line or other between hemp and marijuana. If the government were to say that we do not interpret the regulation any differently than the statute, then there'd be no controversy, would there be? Not with respect to that claim, your honor. That's right. That's the only claim you're making? No, your honor. The other claim that we're making is that DEA's failure to explain its change of position with respect to its obligation under 21 U.S.C. 811 D-1 to subject epidiolex to schedule five... Why is epidiolex of any concern to you? Because as the government explains in its brief, DEA apparently views epidiolex as hemp, and we are the hemp industries association. And if epidiolex is a material that DEA views itself as compelled to subject to control under 811 D-1 to ensure treaty compliance, then presumably it would also view the rest of hemp as, you know, requiring the same level of control. If the government were to deny that, then there's still no controversy, right? If the government were to deny it, but in footnote 10 of the government's brief, the government doesn't deny it. It in fact says... We'll see what the government says about that. But certainly on the first point, just as my colleague Judge Rogers pointed out, there'd be no standing if the government did not take a different position than you with respect to the interpretation of the regulation vis-a-vis the statute. If the government took the position the regulation is no different than the statute, then there'd be no controversy over that issue. I want to agree, but there's just one problem, and that's just Chenery, because the interim final rule is what's at issue here. And the interim final rule certainly doesn't track the statute. The regulation that's in the Code of Federal Regulations is not the same as the statute, and so whatever the government says in this case doesn't change the fact that when anyone, including local law enforcement regulators, go to look to federal law, which they do, to determine what's criminal and what's not at state law, for example... No, no, if the government were to say, we have no... We had never intended any interpretation different than the statute, they would be bound by that in the future, so... They would be bound in the case of an enforcement action. Of course, we don't have to wait for an enforcement of an unlawful regulation in order to have standing to challenge... If the government takes a position that the language in the regulation means the same as the statute, there wouldn't be any controversy in the case at all, but we'll see what the government says. Yes, your honor. I would like to... No, Mr. Pennington, just so I'm clear to follow up on Judge Silverman's point, the statute talks about hemp. The regulation defines hemp and concludes that only this hypernex meets the test. Is that your point? I'm not sure that I understand the question, your honor. Could you please repeat it? Well, I thought your argument was there's a statute that refers to hemp and authorities the government has, and then the agency comes along and issues a regulation which defines certain statutory terms. And in so defining those terms, it has, in your view, created this problem. That's right, your honor. All right. So when you read the plain text of the statute, and then you look at the plain text of the regulation, your position is, regardless of what the government may say now, what it has promulgated in the interim final rule is simply either inconsistent with the statute or it has to revise its rule. Precisely. In other words, your point is, since the government has taken the position not only in the interim rule, and confirmed it as it were in its brief, for counsel to make a concession to us only goes so far in the sense that unless counsel tells us the commission has specifically authorized this concession, I'm not clear what it's worth. I completely agree, your honor. And if I could emphasize the court is held in, we cite this case in our brief, it's Americans for Safe Access versus DEA. It's a 2013 case. And in that case, the court recognized that when DEA puts a substance in schedule one of the Controlled Substances Act, that is a quote, inherently pejorative classification that the government means and intends and knows will influence third party regulators and lawmakers. And it does. And we cited cases in our brief where that has in fact happened both before and after the 2018 Farm Bill and the interim final rule. And the point there is that this, whatever they might say in this case, your honor, it has already caused us harm, reputational harm by making this authoritative and inherently pejorative statement about a substance that we use. To give an example, it would be like a cake company, for example. And if DEA were to say that flour and eggs were schedule one controlled substances, that would, to say that the- Wait a minute, counsel, I don't know what you're talking about. The whole burden of your case is that the term in hemp is somehow broader than defined as hemp. That's right. That's right, your honor. And that is your whole case, right there. And on looking at it, it doesn't look to me to be intended to be any different. But, and I took from the government's brief, but there was no intention to make a difference here. If there is no difference, then there's no case. If I could explain the difference, I think you put your finger directly on the very important point with respect to this claim. And so- Mr. Pennington, while you're answering that question, would you point to the specific is on the last sentence on the left-hand column in the federal register at 51641. Is that what you're depending on when they say a cannabis derivative extract or product that exceeds the THC limit is a schedule one controlled substance, even if the plant is less than the 0.3% THC. Is that what you're relying on? No, your honor. I would point on the same page, 51641 on the third column in a section titled removal of schedule five control over FDA approved products. And I know that- Yes, your honor. But they give an example there that I think illustrates the point well. So if you'll hear me out here, it's in the last paragraph there that begins with note, quote, note that CBD in a mixture with a Delta nine THC concentration greater than 0.3% by dry weight is not exempted from the definition of marijuana or tetrahydrocannabinols. That means that the natural tetrahydrocannabinols in hemp are not just marijuana. This example, it would be marijuana. And I don't dispute that. But the point here is that it's also natural tetrahydrocannabinols according to DEA in the interim final rule. And that is unlawful. The reason, and it has consequences for this industry because the sentencing under 21 USC 841, the sentences that are applicable to tetrahydrocannabinols versus marijuana differ greatly and- You're diverting from the key point. Your key language difference is in hemp versus defined as hemp, right? Yes, your honor. Okay. Now tell me why the term defined as hemp is somehow more restrictive than in hemp for you and having, what is the injury to you because of that difference? Because delta-9 tetrahydrocannabinol is always 100% delta-9 tetrahydrocannabinol by definition. But in order for that substance to be hemp under the statute, it would have to be not more than 0.3% delta-9 tetrahydrocannabinol. And that's impossible. That's impossible. So the effect of DEA's rule is to reimpose the 0.3% threshold on to the tetrahydrocannabinols definition, which is something that Congress did not do and couldn't have meant to do. And so- Are you sure you're not challenging the statute? Yes, your honor, because we don't... The definition of tetrahydrocannabinols in the 2018 Farm Bill was a codification of HIA-VDEA-2. In that case, the Ninth Circuit explained and held unequivocally that natural tetrahydrocannabinols are not schedule one tetrahydrocannabinols. And I think that may be a broader statement than the Ninth Circuit said. In my recollection, the Ninth Circuit said that the material that part parts of the plant that were not defined as marijuana could not be reached indirectly through the definition of TCH, THC. Yes, your honor. And natural tetrahydrocannabinols... I see that my time's up. Can I answer? Go ahead. Thank you, your honor. HIA-VDEA-2, you did say the holding correctly. The point though is that every natural tetrahydrocannabinol is contained naturally in hemp. Therefore, by excluding tetrahydrocannabinols in hemp, Congress necessarily excluded all natural tetrahydrocannabinols. Counsel, I'm still trying to... Forgive me, my colleagues who just let me ask this one question. I'm still trying to figure out why the language difference that you focused on has an impact on you. What is it that in hemp allows you to do that definition of hemp does not? The way that it affects us is that we are, by necessity, every hemp company is handling natural delta-9 tetrahydrocannabinol. And when you look at natural delta-9 tetrahydrocannabinol, everyone agrees that if it's not from an excluded part of the cannabis plant, it is marijuana. There's no dispute about that. But because it could be coming from an exempted part... You're still not linking it up to the language change that you're focusing. You're missing that. Why are you missing that? What is it about the language difference that causes you a problem? The language difference, not general policy. What about the language? The difference between tetrahydrocannabinols in hemp and tetrahydrocannabinols that meet the definition of hemp is that delta-9 would have to be 0.3% of itself in order to meet the definition of hemp. And that's impossible. Therefore... And you somehow think that the term in hemp allows you to, in the processing, go above 0.3%. There's a question whether any particular natural delta-9 might be qualified as marijuana, but it cannot qualify as natural tetrahydrocannabinols. That's our point. And so you're correct that we do believe that in processing, if the natural delta-9 level were to spike slightly above the 0.3% threshold somewhere in the process, which... And you think Congress intended something different in hemp from the definition of hemp? Absolutely, Your Honor. Or they would have said definition of hemp. They could have said that. That's not what they said. And they also didn't indicate any... You're getting a pretty broad meaning to the term in hemp, but I think I understand what you're saying. But in order to understand your case, you really would have to read the facts of the other case to understand what it is. Your concern is the processing of the product, you would perhaps over 0.3%. And you're worried about an enforcement proceeding against you in that event. Thank you, Your Honor. That is one concern that we have. But even apart from that concern, if natural delta-9 tetrahydrocannabinol is a Schedule I substance, as the IFR says it is, because it cannot meet the definition of hemp, then other third-party regulators can enforce against my clients and hemp companies across the country, not because they're handling marijuana, but because according to DEA, they're handling natural tetrahydrocannabinols. So it opposes a double layer of criminalization of something that is an essential part of this industry. And that is unlawful. We'll see when the government has a chance to respond. Thank you, Your Honor. All right. Judge Rogers, do you have any questions? Not now. Thank you. All right. We'll give you a couple minutes in reply, Mr. Pennington. Ms. Carroll, good morning. Good morning. Thank you, Your Honor. May it please the Court, Sarah Carroll, on behalf of the government. As the Court is aware, in the Farm Bill, Congress removed substances that it defined as hemp from the CSA Schedules, and the rule under review merely does the same to DEA's list of controlled substances. I want... Counsel, please, come to the core issue. What about counsel's argument that the regulation, by using the term defined as hemp, is more restrictive than the term in hemp? True or not true? Well, the fundamental problem with that argument is that petitioners did not make it in their opening brief. If you look at their opening brief, they do not mention this. You're absolutely right about that. You're absolutely right. I was going to ask that counsel. But let's assume it was implied in the opening brief. I think you may be right, that they did not make the argument. But let's assume it was implied. What's your answer? My answer would be... I mean, it's difficult for me to give too much of an answer because we didn't have an opportunity to brief it. But my answer would be, I think, as you were noting, Judge Rule is simply to conform DEA's regulations to the statute. DEA was not doing anything other than what the statute does. And DEA did not... In other words, your position is, you're saying to the court openly, committing the agency, that the regulation is not intended to have any different meaning than the statute. Yes, I am saying that. I think it's possible that think that the statute means something different than potentially DEA would have thought the statute meant if it had an opportunity to brief this issue. I'm not sure. It's a little hard for me to understand their point. They seem to be saying, if you have a substance that is hemp, because it's low in THC, there is still a problem. Because if you somehow ignored the other parts of the substance and only looked at the THC, of course, the THC would be 100% THC. And I'm not sure I completely understand that. I also don't understand how it is relevant to them because they have submitted no evidence whatsoever of their activities or any injury. I mean, this court has made clear time and again that petitioners challenging agency action have the burden of demonstrating their standing through evidence. They have the same burden of production as a plaintiff moving for a summary judgment in district court. But here there is no evidence whatsoever on these seemingly, I think, pretty nuanced, to say the least, distinctions that petitioners try to draw in their reply brief. But certainly they have not carried the burden of showing that there is some difference between the statute and the rule that would cause a concrete injury to them. Miss Carroll, let's leave the epidiolex alone and go back to left-hand column, last sentence on page 51641. Would you tell me how the agency reads that sentence? As a result, a cannabis derivative extract or product that exceeds the 0.3% THC limit is a Schedule I controlled substance, even if the plant from which it was derived is not or is under the 0.3%. What does the agency say that that means? Forget the epidiolex. Right. Thank you, Your Honor. So forgetting about epidiolex, that if someone takes a cannabis plant that itself would qualify as hemp because it's very low in THC, but then creates some kind of derivative from that plant and the derivative itself is higher in THC, the derivative is controlled as marijuana, even though it's from a hemp plant. All right. Now let me ask you this. The only thing, and this comes from the second case that exceeds the 0.3%, is this WHM and IHM, which would have to be considered a derivative, an extract, or a product. And it's simply part of the process, isn't it, of making the hemp? That is what they say in the other case, Judge Henderson, but they are very adamant in the other case that they are not raising that claim in their challenge to the rule. They certainly could have raised that claim in the right now, saying that language in the rule is wrong and that matters to us because we handle IHM and WHM, as they call it, and that inflicts an injury on us. And if they had raised that issue in their challenge, in their direct challenge to the rule, we would have addressed it and responded to it. But instead, in the second case, on page 60 of their opening brief in that case, they say that they think this court would lack jurisdiction to consider that argument in this case. You're confusing me, referring to this case and that case. Which case? I lost you. So Judge Henderson was asking about the status of intermediate and waste hemp material under the rule, and I was saying that in this case, the petition for review challenging the rule, petitioners have not raised that argument. In their second case, which is the appeal from Judge Boasberg's decision, they are very adamant that they are raising that issue there and that they are not raising it in their petition for review. And indeed, they say... Yes, you're absolutely right. I just was lost between this case and that case. I'm sorry, your honor. Yes, that was not the most precise language, so I'm sorry for being confusing. But Judge Henderson, I think, you know, you raise an issue that petitioners could have chosen to litigate in their petition for review of the rule, whether for strategic reasons or, you know, I guess I can't say why they've chosen to litigate these cases the way that they have, but they chose not to make that argument in their petition for review. All right, well, let me ask you then what the agency considers a derivative extract or product that would exceed the THC limit. What did you have in mind with that sentence? I think I'm not sure I can say much more than what the sentence means, but these days it's very common for companies and for different people to make, you know, oils and things that can, you know, beverages, food, all kinds of things that contain substances taken from the cannabis plant. They're not, you know, the cannabis plant itself, but it's some kind of oil or serum or there are all kinds of different things. And DEA was saying that if a substance like that is created from a cannabis plant, but the substance itself is high in THC, the substance does not qualify as hemp and is subject to regulation under the CSA. So you're not, is the agency's reading of that sentence as excluding hemp? I'm sorry, Your Honor, is the agency's reading that that excludes hemp? You're not talking about hemp in that sentence. Right. We're talking about things that are too high in THC to qualify as hemp. DEA, of course, recognizes that Congress removed hemp from CSA control. And I would like to go back to the summary of your position with respect to petitioner's main argument, which is the language of the regulation differs from the statute in a way that hurts us. And your response is number one, that argument was not made in the opening brief and therefore is forfeited before us. That's your major, and the government has never had an opportunity to respond to that specific point, which is the key point in their argument as they presented here today. Secondly, even if it was legitimately before us, you're stating unequivocally that the regulation is not to be interpreted as any different than the statute. Yes, that's right. All DEA was doing was conforming its regulations to the statute. Even though the language is slightly different. Right. Of course, this court has said time and time again, that an interpretive rule doesn't have to use the exact same language as a statute. And that's all that we have here. No, but okay. But there's no intention to broaden your power in the regulation vis-a-vis the statute. That's right. Again, I want to be careful because it's possible that Mr. Pennington's interpretation of the statute would be different than DEA's interpretation of the statute. So I do not want to- Well, he's not challenging the statute. He's making very clear that he's only challenging the regulation, not the statute. And the premise of his whole position is the regulation is different from the statute and it hurts him. You make a number of points. Number one, he doesn't ever indicate why it hurts him in his opening brief. And he never even makes this statement. The regulation is not, and this commits the agency, is not intended to have any different meaning than the statute. Yes, that's right, Your Honor. Okay. I'm happy to answer any other questions that the court might have. Judge Rogers? Judge Rogers, do you have any questions? No, no, no. Thank you. You were saying something different. Thanks. Okay. And Judge Silberman? No, I'll be interested to hear a reply from- All right. Thank you, Ms. Carroll. Thank you. Mr. Pennington, why don't you take a couple minutes? Thank you, Your Honor. The government did not concede that natural tetrahydrocannabinols are not schedule one tetrahydrocannabinols. That is not the question before us. The question before us is simply, did you challenge in the opening brief the difference between the regulation linguistically and the statute? Yes, Your Honor. Counsel said you did not make that argument, which is you've now said today was your key argument. If you did not make it in the opening brief, how can we allow you to make it in a reply brief? I'm not saying that you should allow me to make an argument for the first time in the reply brief. If you look at page 46 of petitioner's corrected opening brief, you'll see that there we say, on their face, the 2018 Farm Bill's amendments reduce DEA's regulatory authority. We point specifically to the amendment removing hemp. Counsel, that does not say that the regulation is different from the statute, and therefore, we are hurt by the difference in the language of the regulation, which is your core argument today. But we repeatedly say that the regulation violates the statute because it purports to schedule natural tetrahydrocannabinols, which is the point. Counsel, it does not refer to the language. It is not a textual argument. It is, Your Honor. The Supreme Court said we're all textualists now. I want you to be a textualist, Your Honor. There's a difference between tetrahydrocannabinols in hemp and tetrahydrocannabinols that meet the definition of hemp. Natural tetrahydrocannabinols, to meet the definition of hemp, would have to be less than 0.3% of a particular natural tetrahydrocannabinol. Counsel, you did not make the argument in opening brief focusing on the difference in the language. You did not make that argument. Your Honor, respectfully, I believe that we did. It is the argument. Let's assume, arguendo, you made it. What do you say when the government says, wait a minute, the language may be slightly different. The government does not assert. The government asserts that the language of the regulation is exactly the same meaning as the statute. Then there's no controversy. If that's what the interim final rule said, we would agree. The interim final rule- They interpret their own regulations. If they say that we do not interpret this regulation any differently than the statute, then there's no controversy, right? No, Your Honor, because the CSA is a statute that this court has recognized third-party regulators rely on to understand what is criminal behavior in this country. Counsel, if the government says we do not interpret the regulation as giving us any broader authority than the statute, they mean the same thing. Your Honor, the problem is- You can piece the language through and say it means the same, but when they say it means the same, you're not vulnerable. If they said that in the actual regulation, I would agree with you. The problem is that a state lawmaker or a sheriff's office is not going to go look at this- Well, then you'd have a case against the sheriff. That's not before us. That's true, Your Honor, but when you can tell that the government's authoritative position is going to subject my clients to harsher criminal penalties- That is baloney. Your Honor, respectfully- That is absolute baloney. Could I respond to Judge Silverman's question, Your Honor? You say it's salami rather than baloney. Yes, go ahead. We've cited cases, Your Honor, in our briefing where courts, federal courts, have relied on DEA's purported subjection of natural tetrahydric cannabinols to Schedule I control to subject people to harsher criminal penalties than they would have otherwise been subjected to. We pointed to 841 of 21 U.S.C. Section 841, which treats marijuana and tetrahydric cannabinols very differently in terms of the penalties that are involved. There is just simply no question that by subjecting natural tetrahydric cannabinols to Schedule I controls, DEA has opened the hemp industry to harsher criminal sanctions than Congress intended them to be open to, and that is an Article III injury that should- Some sheriff in Nevada would interpret it. Is that your point? Not just some sheriff in Nevada, Your Honor. Drug screening at federal government workplaces now looks for natural tetrahydric cannabinols to tell whether people can get jobs because they believe that the natural tetrahydric- You're assuming. I give up. All right. Judge Rogers, do you have any questions? No, thank you. All right. Then, Madam Clerk, if you would call the next case.
judges: Henderson, Rogers, Silberman